UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JESSICA S. BUUS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner, Social Security<br>Administration;<br><br>                    Defendant. | 4:14-CV-04066-KES<br><br>MEMORANDUM OPINION AND<br>ORDER AFFIRMING THE DECISION<br>OF COMMISSIONER |

Plaintiff, Jessica S. Buus, seeks review of the decision of the
Commissioner of the Social Security Administration denying her claim for
disability insurance benefits (SSDI) under Title II of the Social Security Act, 42
U.S.C. § 423, and for supplemental security income (SSI) under Title XVI of
that Act, 42 U.S.C. § 1382.[1] The Commissioner opposes the motion and moves
the court to affirm the denial. For the following reasons, the court affirms the
decision of the Commissioner.

**PROCEDURAL HISTORY**

Buus applied for SSDI and SSI on October 21, 2011, alleging disability
since March 1, 2011. AR 178, 180, 216, 235.[2] The Social Security

---

[1] Although Buus's complaint and reply brief correctly names Carolyn W.
Colvin as the defendant, Buus's initial brief mistakenly names Michael J.
Astrue as the defendant in the caption. Colvin became the Acting
Commissioner of the Social Security Administration on February 14, 2013.

[2] All citations to "AR" refer to the appropriate page of the administrative
record.

Administration (SSA) denied Buus's applications initially on January 24, 2012, and again upon reconsideration on July 6, 2012. AR 72, 82, 124, 127. Buus then requested an administrative hearing and appeared with counsel before Administrative Law Judge Denzel R. Busick (ALJ) on April 3, 2013. *See* AR 32-71 (transcript of hearing). Thereafter, the ALJ issued an unfavorable decision finding that Buus retained the residual functional capacity (RFC) to perform light work within certain parameters. AR 17. Accordingly, the ALJ denied Buus's claims, concluding a significant number of jobs existed that Buus could perform. AR 25. Buus timely appealed the ALJ's decision and requested review by the Appeals Council, but such request was denied on March 7, 2014.[3] AR 1-4. On April 30, 2014, Buus commenced this action seeking judicial review of the Commissioner's denial of her claims. Docket 1.

## FACTUAL BACKGROUND

Buus was born on June 27, 1983. AR 178. At the time of the hearing before the ALJ, Buus was 29 years old. AR 37. Buus graduated from high school in 2001 and completed one year of college in 2005. AR 37, AR 217. Buus reported working a number of jobs predominantly in the daycare, hotel, and customer services fields. AR 217, AR 269-73. Buus testified at the administrative hearing that, of those jobs, she principally and most recently worked as a daycare assistant. AR 38, AR 40. Her duties primarily dealt with taking care of young children. AR 38. Buus also testified that she was involved

---

[3] Because the Appeals Council denied Buus's request for review, the ALJ's decision represents the final decision of the Commissioner for purposes of judicial review. 42 U.S.C. § 405(g).

in a motorcycle accident in July 2010. AR 40. She explained that the timing of the accident coincided with the onset of most of the pain, fatigue, and other conditions that she reported in her application for SSDI and SSI. AR 40. Buus stated she had not worked since February 2011 due to illness and the worsening of her medical conditions. AR 40. At the time of the hearing, Buus was living with her mother and stepfather in Sioux Falls, South Dakota. AR 40.

I.   **Motorcycle Accident**

On July 11, 2010, Buus was brought to the emergency room of the Sanford USD Medical Center following a motorcycle accident. AR 654. Buus was riding as a passenger without a helmet when a pickup truck pulled in front of the motorcycle. AR 654. The motorcycle collided with the truck and Buus was thrown over the top of the vehicle. AR 654. Buus hit her head on the ground and briefly lost consciousness before emergency medical service personnel arrived. AR 654-55.

At the emergency room, Buus reported pain in her head, left knee, and neck. AR 654. She received treatment from Dr. Robert Harms and several tests were performed. AR 655-58. A CT scan of her cervical spine revealed a mild disc bulge that, according to the doctor's notes, may or may not have been a result of the accident. AR 658. Buus was sent home to rest, and Dr. Harms prescribed hydrocodone for pain and Zofran for nausea. AR 659.

II.   **Back, Knee, and Neck Pain**

Jessica came to see Dr. Todd Sorensen at the Sanford Family Medicine Clinic on July 19, 2010, for a follow up after her recent motorcycle accident.

3

AR 334. Buus stated at the ALJ hearing that Dr. Sorensen is her primary care physician. AR 40. Buus complained to Dr. Sorensen of neck and knee pain, and Dr. Sorensen noted that Buus had suffered a neck injury as a result of the accident. AR 334-35. Dr. Sorensen recommended that Buus rest and apply ice packs to the injured areas, and he recommended that she start physical therapy. AR 334-35. Buus saw Dr. Sorensen again a few weeks later complaining of back pain as a result of the accident. AR 336.[4] Similarly, Dr. Sorensen recommended rest, ice, and physical therapy. AR 336.

Buus continued to follow up with Dr. Sorensen over the next several months, and Dr. Sorensen continued to recommend rest, ice, and physical therapy to combat Buus's pain. AR 339, 341, 343. In December 2010, however, Buus was discharged from Sanford Physical Therapy Solutions due to "[e]xcessive cancellations and no shows." AR 554. Prior to discharge, Buus had reported that she was feeling better and receiving relief from doing her exercises. AR 554. On March 22, 2011, Dr. Sorensen stated that Buus was doing well enough to do physical therapy at home and to schedule follow up appointments on an as needed basis. AR 352.

During this time, Dr. Sorensen referred Buus to the Sanford Orthopedics and Sports Medicine Clinic, where she met with Dr. Geoffrey Haft on

---

[4] The date of this visit is unclear. The timestamp that accompanies Dr. Sorensen's notes indicates that his notes were entered on "3/16/2011," which would be eight months after the motorcycle accident. AR 336. Nonetheless, Dr. Sorensen's note states that onset of the Buus's back pain was "3 weeks ago," and that the mechanism of the injury was the motor vehicle accident that occurred on July 10, 2010. AR 336.

4

September 21, 2010, to discuss her neck pain. AR. 305. Dr. Haft observed that Buus had a disc herniation in her neck, but that physical therapy and NSAIDs were helping. AR 305. Dr. Haft recommended Buus continue a conservative treatment regime and that a steroid injection be given to further alleviate her neck pain. AR 306. Buus met with Dr. Mary Harris at the Sanford USD Medical Center on October 30, 2010, complaining of neck pain and numbness. AR 561. Dr. Harris noted that Buus described her pain dramatically, but that she seemed fairly comfortable at the time of their visit. AR 563. Buus then returned to Dr. Haft on November 23, 2010, and stated that the injection helped relieve her neck pain for a couple of days. AR 299. Dr. Haft recommended physical therapy, anti-inflammatory drugs, and chiropractic treatment. AR 299. Additionally, Dr. Haft stated that he wanted to wait between nine to twelve months after the motorcycle accident before considering any surgical options. AR 299.

Buus was subsequently referred to Sanford Physical Medicine Rehabilitation Specialists, where she met with Dr. Troy Gust on November 7, 2011, to discuss her ongoing neck pain. AR 750. Dr. Gust ordered an EMG[5] and recommended that Buus return to her home exercise program. AR 751. Buus met with Dr. Thomas Boetel on November 15, 2011, to discuss the results of the EMG. AR 760. The EMG report was normal, although Buus continued to report neck pain. AR 760. Dr. Boetel recommended that Buus

---

[5] An EMG or "Electromyography" examination is "[t]he recording of electrical activity generated in muscle for diagnostic purposes[.]" *Stedman's Medical Dictionary* 622 (28th ed. 2006).

continue physical therapy. AR 761. Buus visited the Sanford USD Medical
Center on December 21. 2011, for physical therapy, but she was discharged
after calling to cancel her remaining sessions. AR 466.

For her knee pain, Buus met with Dr. Kristofer Kimber at the Sanford
Orthopedics and Sports Medicine Institute on October 11, 2010. AR 301.
Dr. Kimber noted that Buus was experiencing pain, but that she did not have
any significant mechanical symptoms or swelling. AR 302. Dr. Kimber
recommended physical therapy and prescribed the anti-inflammatory drug
Mobic. AR 302. During a follow up in November, Buus was given a steroid
injection in her knee. AR 300. An MRI was taken on January 21, 2011. AR 298.
Following the MRI, Dr. Kimber recommended Buus continue physical therapy,
and that Buus could return on an as needed basis. AR 297. On August 28,
2011, Buus received a corticosteroid injection in her right knee, which yielded
immediate pain relief. AR 295. On September 22, 2011, Buus was discharged
from receiving physical therapy for her right knee due to three successive no-
shows. AR 475. According to the discharge summary, Buus had only attended
her initial evaluation. AR 475. Buus appeared for an unscheduled follow up
with Dr. Kimber on July 20, 2012. AR 849. Dr. Kimber continued to
recommend non-operative treatment, and he recommended a rheumatology
exam for possible arthritis. AR 849.

For her back pain, Buus saw Dr. Sorensen again on June 14, 2011. AR
362. Dr. Sorensen did not, however, adjust Buus's medication or recommend
additional treatment beyond physical therapy. AR 365. Buus then saw

6

Dr. Sorensen on July 18, 2011, complaining of similar pain symptoms. AR 366. A physical exam was conducted, which Dr. Sorensen noted as "generally normal." AR 367. Buus was then prescribed Percocet for pain. AR 367. Buus met with Barbara Belkham, a physician's assistant, on January 8, 2012, complaining of lower back pain. AR 786-87. Belkham recommended continued use of ice and stretching. AR 789.

## III.   Fibromyalgia

Reference to fibromyalgia[6] first appeared as a medical assessment following a visit with Dr. Sorensen on May 12, 2011. AR 357-58. When Buus arrived that day, she complained of fatigue and body aches. AR 357. Buus returned to see Dr. Sorensen on May 17, 2011, reporting symptoms of fatigue, aches, and muscle pain. AR 359. Dr. Sorensen again gave an assessment of fibromyalgia. AR 361. When Buus saw Dr. Sorensen in August 2011, she reported that had a history of fibromyalgia that was made worse following the motorcycle accident. AR 368. Following this appointment, Dr. Sorensen prescribed Elavil.[7] AR 369. Dr. Sorensen continued to see Buus for treatment

---

[6] "Fibromyalgia" is defined as "[a] common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." *Stedman's Medical Dictionary*, 725 (28th ed. 2006).

[7] Elavil is an antidepressant. *See* Drugs.com, http://www.drugs.com/ elavil.html (last visited May 15, 2015). This medication was also prescribed for Buus's depression. AR 369.

of her fibromyalgia on several occasions, and he prescribed Neurontin[8] on January 27, 2012. *See, e.g.*, AR 804, 814, 818.

After meeting with Dr. Kimber in July 2012 for her knee pain, Buus then met with Dr. Sheetal Sudhir Gavankar at the Sanford Rheumatology Clinic for an evaluation of inflammatory arthritis. AR 849, 862. A joint exam was performed, which showed "12/18 fibromyalgia tender points." AR 864. Dr. Gavankar suspected that the majority of Buus's body pain was related to fibromyalgia, and she recommended Cymbalta and aquatic therapy. AR 866. Dr. Sorensen prescribed Cymbalta[9] to Buus on August 28, 2012, after she returned for an evaluation of her depressive symptoms and complaining of fatigue. AR 917, 921. Buus saw Dr. Sorensen on November 5, 2012, complaining of fatigue and joint pain, and was prescribed Methotrexate.[10] AR 1010, 1015. Buus saw Dr. Sorensen again on December 17, 2012, for fatigue and joint pain. AR 1083. Buus had shown some improvement, and her Methotrexate prescription was increased. AR 1083, 1087.

---

[8] Neurontin is an anti-epileptic medication that can also be prescribed for pain. Drugs.com, http://www.drugs.com/neurontin.html (last visited May 13, 2015).

[9] "Cymbalta . . . is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI)" which can also be prescribed for adults with fibromyalgia. Drugs.com, http://www.drugs.com/cymbalta.html (last visited May 13, 2015).

[10] "Methotrexate interferes with the growth of certain cells of the body," and is used to treat certain types of cancer as well as psoriasis and symptoms of arthritis. Drugs.com, http://www.drugs.com/methotrexate.html (last visited May 13, 2015).

## IV.   Headaches

Reference to ongoing headaches first appeared in Buus's medical records on April 15, 2011, when she met with Barbara Schlenker, a licensed nurse practitioner, and Lindsay Speer, a certified nurse practitioner, at the Sanford Family Medicine Clinic. AR 353. During that appointment, Buus complained of several other symptoms in addition to her headaches, and she stated that they had all persisted for several months. AR 353.

Buus came to the Sanford USD Medical Clinic emergency room on May 27, 2011, complaining of a strong headache. AR 487. She was seen by Dr. Beth Lapka. AR 487. Accompanying her headache, Buus complained of light sensitivity and nausea. AR 487. Buus was given Reglan[11] and Benadryl, and Dr. Lapka's notes indicate that Buus's headache improved. AR 489. Dr. Lapka's notes also state, however, that Buus reported she did not have a history of frequent headaches at this time. AR 489.

Buus met with Dr. Sorensen on October 11, 2011, complaining of recurring headaches that arose between four and five times per week. AR 370. Dr. Sorensen prescribed verapamil,[12] and asked her to keep a headache diary. AR 373. Dr. Sorensen also recommended that Buus continue a prophylactic

---

[11] "Reglan . . . increases muscle contractions in the upper digestive tract" and is typically used to treat heartburn. Drugs.com, http://www.drugs.com /reglan.html (last visited May 13, 2015).

[12] "Verapamil is a calcium channel blocker" that relaxes muscles of the heart and blood vessels. Drugs.com, http://www.drugs.com/verapamil.html (last visited May 13, 2015).

therapy regime by taking beta blockers and to lie in a dark room while applying cold packs for pain relief if a headache occurred. AR 373.

## V.    Depression and Anxiety

Buus has a history of depression and anxiety that predates her motorcycle accident. On March 14, 2010, Buus met with Barb Belkham and complained of a depressed mood and anxiety. AR 318.[13] Belkham's notes indicate that Buus previously received treatment, but had not received counselling for her condition. AR 318. Belkham recommended that Buus's Zoloft[14] dosage be increased, that Abilify[15] would be added, and that counseling should be pursued. AR 320.

Buus met with Dr. Sorensen on September 1, 2010, for one of her follow up appointments after the motorcycle accident. In addition to pain, she reported experiencing anxiety while riding in a car. AR 339. On April 15, 2011, Buus met with Barbara Schlenker and Lindsay Speer. AR 353. According to Schlenker, Buus reported that she was feeling anxiety and trouble concentrating. AR 353. Speer noted that Buus said she had been dealing with depression since high school. AR 353. Speer concluded that Buus's Zoloft

---

[13] The medical records from this visit include a Past Medical History section and a bullet point entry that references "Depression, anxiety" attributed to March 23, 2007. AR 319.

[14] Zoloft is an antidepressant that is used to treat depression, anxiety, and several other disorders. Drugs.com, http://www.drugs.com/zoloft.html (last visited May 13, 2015).

[15] Abilify is an antipsychotic medication that is often used in combination with other medicines to combat depression in adults. Drugs.com, http://www.drugs.com/abilify.html (last visited May 13, 2015).

dosage should be increased, and she also recommended Abilify. AR 354. Buus met with Dr. Sorensen again on May 12, 2011, for an evaluation of her depression symptoms. AR 357. Dr. Sorensen indicated that Buus was not tolerating the increased Zoloft dosage, so she was reverted back to earlier levels. AR 357. Counseling was again advised, and Triazolam was added to combat sleeping difficulties. AR 358. Buus revisited Dr. Sorensen on several later occasions to evaluate her depressive symptoms. AR 362, 366, 814, 917, 1007, 1083. Buus's medication was eventually adjusted to include other medicines such as Elavil and Cymbalta, although those medications were also a part of her fibromyalgia treatment. AR 369, 921.

Buus sought counseling and therapy related to her depression from the Marriage & Family Therapy Clinic on November 1, 2011. AR 748. Her intake assessment includes Buus's belief that her anxiety worsened after the motorcycle accident, and that she had since become more isolated. AR 748. The record also contains notes from five treatment sessions at the clinic. AR 744-47. According to the summaries in those records, the sessions primarily focused on relaxation techniques to help alleviate anxiety and pain. AR 744-47, AR 749.

## VI.   Eye Condition

Reference to Buus's vision problems first appear in her medical records following a visit with Dr. Carol Byrd at the Sanford Eye Center on January 25, 2013. AR 902. Buus reported an "onset of floaters in the last month." AR 902. Buus then saw Dr. Michael Vanden Bosch on February 5, 2013, who diagnosed

Buus's condition as pars planitis of the right eye.[16] AR 903. Dr. Vanden Bosch

prescribed steroid eye drops and instructed Buus to return in approximately

two weeks. AR 903. Buus returned on February 19, 2013, and Dr. Vanden

Bosch's notes indicate the condition was "stable" at that time. AR 904.

Dr. Vanden Bosch made a similar notation during Buus's March 20, 2013,

appointment, although he also noted the possible presence of more cells. AR

905.

## ALJ DECISION

On April 16, 2013, the ALJ issued a decision denying Buus's application

for benefits. AR 13-26. In doing so, the ALJ used the sequential five-step

evaluation process.[17] At step one, the ALJ determined that Buus had not

---

[16] Pars planitis "is an immunological disorder of the eye characterized by
inflammation of a part of the uvea, the layer of tissue between the sclera and
the retina, [and/or] the membranes protecting the eyeball." WebMD,
http://www.webmd.com/a-to-z-guides/pars-planitis (last visited on May 13,
2015).

[17] An ALJ must follow " 'the familiar five-step process' " to determine
whether an individual is disabled. *Martise v. Astrue*, 641 F.3d 909, 921 (8th
Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). 20
C.F.R. § 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we consider
your work activity, if any. If you are doing substantial gainful activity, we will
find that you are not disabled. . . . (ii) At the second step, we consider the
medical severity of your impairment(s). If you do not have a severe medically
determinable physical or mental impairment that meets the duration
requirement of § 404.1509, or a combination of impairments that is severe and
meets the duration requirement, we will find that you are not disabled. . . . (iii)
At the third step, we also consider the medical severity of your impairment(s). If
you have an impairment(s) that meets or equals one of our listings in appendix
1 of [subpart P of part 404 of this chapter] and meets the duration
requirement, we will find that you are disabled. . . . (iv) At the fourth step, we
consider our assessment of your residual functional capacity and your past
relevant work. If you can still do your past relevant work, we will find that you

engaged in substantial gainful activity since March 1, 2011. AR 15. At step two, the ALJ found that Buus was suffering from several severe impairments, namely: fibromyalgia, headaches, degenerative disc disease of the cervical and lumbar spine, obesity, depression, and anxiety. AR 15. The ALJ further determined, however, that Buus's vision problems did not qualify as a severe impairment. AR 15. At step three, the ALJ determined that Buus did not have an impairment or combination of impairments that met or medically equaled a listed impairment. AR 15-18. At step four, the ALJ found that Buus had the RFC to perform light work within certain parameters. AR 18. Based on this RFC determination, the ALJ concluded that Buus could not perform any past relevant work. AR 24. At the fifth and final step, the ALJ considered testimony of a vocational expert and determined that Buus was capable of performing other jobs that existed in significant numbers in the national economy. AR 24-25. Accordingly, the ALJ found that Buus was not disabled and thus did not qualify for benefits under the Social Security Act.

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner as to any fact, if supported by substantial evidence, shall

---

are not disabled. . . . (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled."

be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011).
"Substantial evidence is 'less than a preponderance, but is enough that a
reasonable mind would find it adequate to support the Commissioner's
conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting
*Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). The court considers
evidence that both supports and detracts from the ALJ's decision. *Moore v.
Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If the Commissioner's decision is
supported by substantial evidence in the record as a whole, the court may not
reverse it merely because substantial evidence also exists in the record that
would support a contrary position or because the court would have determined
the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002)
(citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by
substantial evidence in the record as a whole, the court reviews the entire
administrative record and considers six factors: (1) the ALJ's credibility
determinations; (2) the claimant's vocational factors; (3) medical evidence from
treating and consulting physicians; (4) the claimant's subjective complaints
relating to activities and impairments; (5) any third-party corroboration of
claimant's impairments; and (6) a vocational expert's testimony based on
proper hypothetical questions setting forth the claimant's impairment(s).
*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir.
1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

### I.   Whether the ALJ Erred in Failing to Include Buus's Eye Condition as a Severe Impairment at Step Two of the Sequential Analysis

The ALJ concluded that Buus's fibromyalgia, headaches, degenerative disc disease of the cervical and lumbar spine, obesity, depression, and anxiety were severe impairments. As for Buus's eye condition, however, the ALJ found that "there is no indication this impairment has lasted, or is likely to last, longer than 12 months." AR 15.[18] Therefore, the ALJ concluded "it cannot serve as a basis for disability under the Regulations." AR 15.

Buus contends that the ALJ erred at step two by failing to identify her eye condition as severe. At step two, a claimant must establish whether she has a medically determinable physical or mental impairment that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii); *see also Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that his

---

[18] The ALJ also concluded that Buus's endometriosis was not a severe impairment. AR 15. Buus does not challenge the ALJ's conclusion on this point.

impairment or combination of impairments are severe.") (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). For an impairment to be severe, it must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. §§ 404.1520(c); 416.920(c), which includes the claimant's capacity for sight. 20 C.F.R. §§ 404.1521(b)(2); 416.921(b)(2). A severe impairment must also meet a durational requirement of having lasted, or being expected to last, for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 416.909, 416.920(a)(4)(ii).

The Commissioner argues that any failure on the part of the ALJ to consider Buus's eye condition as a severe impairment was rendered harmless because the ALJ continued on to step three. The Eighth Circuit has held that a failure to correctly identify a severe impairment at step two even though other severe impairments are found at that step is not necessarily harmless. *See Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) ("[W]e reject the Commissioner's argument of harmless error. We are persuaded by Nicola's assertion . . . that the ALJ erred in failing to find that her diagnosis of borderline intellectual functioning was a severe impairment."). Therefore, the court turns to whether the ALJ's determination regarding Buus's eye condition at step two is supported by substantial evidence in the record as a whole.

The ALJ issued his decision on April 16, 2013. At that time, Buus wore corrective lenses. AR 234. And the only evidence pertaining to Buus's eye condition comprised of a small amount of medical records from January 2013 to March 2013. AR 902-905. On January 25, 2013, Buus complained of a new

16

onset of "floaters" within the last month (AR 902); Buus was diagnosed with pars planitis of the right eye and given steroid eye drops on February 5, 2013, (AR 903); by February 19, 2013, Buus's condition was "stable" (AR 904); and as of March 20, 2013, Buus's condition remained stable with questionably more cells present (AR 905). At the ALJ hearing, Buus described her condition as causing blurry vision in her right eye, and she testified that she had visited with Dr. Vanden Bosch the day prior to the hearing. AR 63. The record from that visit was not before the ALJ, although Buus acknowledged that Dr. Vanden Bosch did not issue any more definitive findings. AR 63. Consequently, the only evidence before the ALJ concerning Buus's eye condition was that it was relatively new and had stabilized after Buus received medical treatment.

Buus did, however, submit medical records regarding her eye condition that were generated subsequent to the ALJ hearing. These records were provided to and reviewed by the Appeals Council when it declined Buus's request for review. AR 4 (providing notice that the Appeals Council considered "Medical Records from Sanford Eye Center dated March 22, 2013, through August 16, 2013."). Because the Appeals Council considered this new evidence, the court should "include such evidence in the substantial evidence equation." *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995).

This evidence reveals the following: On April 2, 2013, the day before her hearing with the ALJ, Buus saw Dr. Vanden Bosch and complained that her vision was blurry. AR 1267. Dr. Vanden Bosch gave Buus an eye injection that day, which alleviated some of the blur for approximately one week. AR 1268,

17

1300. Buus met Dr. Vanden Bosch again on July 16, 2013, and she reported that her vision was a little better, and that she experienced fewer floaters and less blurriness. AR 1396. Buus requested another appointment on August 16, 2013, however, complaining of increased vision blur and more floaters. AR 1408. While an appointment was scheduled for August 20, 2013, the administrative record ends without the medical records from that appointment or subsequent appointments, if any. *See* AR 1408-16.

First, the evidence shows that for approximately eight (rather than at least twelve) months, Buus experienced some degree of blurry vision in her right eye that tended to improve and recede with treatment. *See Wiseman v. Sullivan*, 905 F.2d 1153, 1157 (8th Cir. 1990) (concluding the claimant had only introduced evidence that his impairment persisted for ten months). Second, even if the condition persists, the medical records do not indicate that the condition significantly limits Buus's capacity for sight or any other basic work activity. For example, by May 16, 2013, Buus's visual acuity is listed as "20/20" in her left eye, and "20/50 +1" in her right eye, and that she was wearing corrective lenses. AR 1313. Consequentially, substantial evidence supports the ALJ's determination that Buus's eye condition was not a severe impairment.

## II.    Whether the ALJ Erred in Applying the Listings

Buus contends that the ALJ failed to properly evaluate the medical equivalency of her headaches and fibromyalgia to certain listed conditions. As to Buus's headaches, the ALJ found, "[t]he claimant alleges a history of severe

18

headaches, which are not specifically included in the Listing of Impairments in the Regulations. Thus, the allegations of severe headaches neither meet nor equal a listing." AR 16. Similarly, regarding her fibromyalgia, the ALJ found ". . . fibromyalgia is not specifically included in the Listings of Impairments in the Regulations. Accordingly, the claimant's allegation of fibromyalgia neither meets nor equals a listing." AR 16. And regarding all of Buus's impairments, the ALJ concluded that "the impairments, individually and in combination, do not meet or equal a listed impairment." AR 15.

The Listing of Impairments contained in Appendix 1 of 20 C.F.R. part 404, subpart P, "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). At step three, the ALJ must determine whether a claimant's impairments, when taken individually or in combination, meet or are medically equal to a listed impairment. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003). If a claimant has an unlisted impairment or impairments,[19] "[the ALJ] will compare [the claimant's] findings with those for closely analogous listed impairments." 20 C.F.R. §§ 404.1526(b)(2), 416.926(b)(2). Similarly, when a claimant has "a combination of impairments, no one of which meets a listing . . . [the ALJ] will compare [the claimant's] findings with those for closely analogous listed

---

[19] Buus acknowledges that neither headaches nor fibromyalgia are listed impairments. Docket 11 at 21.

impairments." 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3). To be medically equivalent, an impairment or combination of impairments must be "at least equal in severity and duration to the criteria in any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). "Medical equivalence must be supported by medical findings; symptoms alone are insufficient." *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008). The claimant bears the burden of establishing that her impairment or impairments equal a listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

Buus argues that the ALJ did not specifically discuss whether her headaches were medically equivalent to Listing 11.03 or whether her fibromyalgia was medically equivalent to Listing 14.09. Although Buus is correct, the ALJ's lack of explicit analysis does not, standing alone, warrant reversal. As the Eighth Circuit has explained, "[t]here is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see also Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006) (the fact that ALJ did not elaborate on conclusion that claimant did not meet or equal any listed impairment did not require reversal "because the record supports [the ALJ's] overall conclusion"); *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) (concluding that ALJ's failure to address a specific listing is not reversible error if record supports overall conclusion). Thus, the question is

20

whether the record supports the ALJ's overall conclusion that Buus's impairments did not equal a listed impairment.

### A.    Is Buus's History of Headaches Medically Equivalent to Listing 11.03?

The SSA has issued guidelines known as the Program Operations Manual System (POMS) to assist agency employees processing claims for benefits. The Eighth Circuit has concluded that "[a]lthough POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003) (citations omitted). Specifically, POMS guideline DI 24505.015 discusses medical equivalence.[20] This guideline contains several example rationales–and the guideline expressly states they are "examples only"–of how medical equivalence determinations can be made. One example reads:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals

---

[20] SSA, *Finding Disability Based on the Listing of Impairments*, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424505015 (last visited May 13, 2015).

listing 11.03.

Listing 11.03 provides:

> Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. part 404, subpt. P, App. 1, § 11.03.

Although Buus faults the ALJ for not specifically making this comparison, Buus does not explain how the medical evidence she provided would have established an equivalency between the severity of her headaches and each of the criteria in Listing 11.03. "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Carlson v. Astrue*, 604 F.3d 589, 594 (8th Cir. 2010) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)) (emphasis in original). For example, one criterion in 11.03 requires the frequency of epileptic episodes–or in Buus's case, headaches–to occur more than once weekly in spite of at least 3 months of prescribed treatment. Here, the record shows that Buus first complained of recurring headaches on April 15, 2011, when she met with Barbara Schlenker and Lindsay Speer, although she was not prescribed any treatment. AR 353. Approximately a month later, Buus then reported to the emergency room for a migraine. AR 487. Dr. Lapka gave her Reglan and Benadryl that day, which improved her symptoms. AR 489. Dr. Lapka noted,

22

however, that Buus did not have a history of frequent headaches at this time. AR 489. Then Buus came to Dr. Sorensen on October 11, 2011, complaining of headaches that occurred four to five times per week. AR 370. Dr. Sorensen prescribed Buus 30 tablets of verapamil to be taken once daily for her headaches. AR 370, 373. Although Buus never received a refill of verapamil, a notation by Dr. Sorensen officially discontinuing the prescription was not entered until April 20, 2012. AR 835. During the period from when verapamil was prescribed and eventually discontinued, however, there are no records from any medical provider indicating that Buus sought treatment for headaches occurring more than once a week, whether or not migraine headaches. After that period, references to headaches appear infrequently and accompany some other condition. *See* AR 1258 (message sent from Buus to Dr. Vanden Bosh at Sanford Eye Center on March 29, 2013 mentioning headaches accompanying blurry vision); AR 1408 (similar message dated August 16, 2013). Again, however, the record does not show that Buus experienced weekly headaches in spite of at least three months of prescribed treatment. For this reason, and because Buus has not shown an equivalence between the severity of her headaches and any of the other criteria in Listing 11.03, substantial evidence supports the ALJ's decision that Buus's headaches neither met nor equaled a listed impairment.

### B.      Is Buus's Fibromyalgia Medically Equivalent to Listing 14.09?

The SSA has also issued various Social Security Rulings (SSRs) that, *inter alia,* provide a means of elucidating SSA policy. SSRs do not have the

force of law, but do bind the SSA. *Newton v. Chater*, 92 F.3d 688, 693 (8th Cir. 1996); *see also* 20 C.F.R. § 402.35(b). Cogent to this issue is SSR 12-2P, wherein the SSA set out to "provide guidance on how [the agency] develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [the agency] evaluate[s] fibromyalgia in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act." *SSR 12-2P*, 2012 WL 3104869 at *1 (SSA 2012). The SSR notes that fibromyalgia is not a listed impairment, but that it may medically equal a listing. *Id.* at *6. As an example, the SSR states that fibromyalgia may be medically equivalent to Listing 14.09D, which pertains to inflammatory arthritis. *Id.* Accordingly, Buus contends that her fibromyalgia should have been compared to inflammatory arthritis.

While the SSR specifically mentions Listing 14.09D as an example, Buus suggests her fibromyalgia is medically equivalent to Listings 14.09A or 14.09B.[21] Listing 14.09A is,

Persistent inflammation or persistent deformity of:

1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or
2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).

20 C.F.R. part 404, subpt. P, App. 1, § 14.09A. And Listing 14.09B is,

---

[21] In her brief, Buus refers to Listing 14.09A as "14.09," although the criteria Buus lists corresponds with those in 14.09A. *See* Docket 11 at 23.

Inflammation or deformity in one or more major peripheral joints with:

1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. part 404, subpt. P, App. 1, § 14.09B. Buus's sole argument that the severity of her fibromyalgia is medically equivalent to the criteria laid out in 14.09A and 14.09B is that ample medical evidence shows that she suffers severe fatigue and chronic pain. Accepting that as true, however, would only go toward the "constitutional symptoms or signs" criterion of Listing 14.09B, without addressing the other requirements for 14.09B or 14.09A. And Buus presents no argument for why her headaches and fibromyalgia in combination would medically equal a listing. Thus, substantial evidence supports the ALJ's conclusion that Buus's impairments, whether individually or in combination, did not medically equal a listed impairment.

## III. Whether the ALJ Erred in Determining Buus's RFC

Before an ALJ moves to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). A claimant's RFC "is the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's limitations. 20 C.F.R. §§ 404.1545(b); 416.945(b). " 'The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical

25

records, observations of treating physicians and others, and an individual's own description of [her] limitations.' " *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). The RFC must include the limitations from all medically determinable impairments, regardless of whether they are considered severe. *See* SSR 96–8p, 1996 WL 374184 at *5 (SSA 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' ").

In determining Buus's RFC, the ALJ considered Buus's motorcycle accident, her complaints of pain in her joints, back, neck, knees, shoulders and wrists, as well as numbness, fatigue, body aches, fibromyalgia, headaches, anxiety, depression, and medications. AR 18-22. The ALJ made findings on Buus's credibility, and considered medical opinions from Dr. Sorensen as well as several state agency physicians. AR 22-24. The ALJ ultimately determined Buus had the RFC to perform light work within the following parameters:

> She can lift and carry 20 pounds on occasion and 10 pounds, or less, frequently. With normal work break, she can sit 6 hours as well as stand and walk, combined, 6 hours in an 8-hour workday. She can climb stairs occasionally but must avoid ladders, scaffolds, and ropes. She can occasionally balance but stoop, kneel, crouch, and crawl only occasionally. She has no reaching, manipulation or communication limits, and no visual limits - with glasses. She must avoid concentrated exposure to hazards, such as unprotected heights, fast and dangerous machinery. She has chronic pain and discomfort, but with appropriate medication can be active at these limits. She has mild limits in activities of daily living, with moderate limits on social functioning and concentration, persistence and pace. The term "mild" as used herein and defined for the vocational expert means slightly affected, but not interfering in work activity, while the term

> "moderate" means affected, not precluded, such that a person is
> performing at lower acceptable limits for most workplaces. As
> defined, she has moderate limits in interacting with the public, in
> getting along with co-workers, and in accepting instruction or
> criticism from supervisors. She is moderately limited in carrying
> out detailed instructions, maintaining extended concentration, and
> adapting to changes in work routine or setting. She is limited to
> brief, superficial contact with others, and to performing simple,
> routine, and repetitive tasks of three steps on average.

AR 18.

## A.    Buus's Credibility

"[W]hen evaluating a claimant's credibility, in addition to considering the
absence of objective medical evidence to support complaints of pain, an ALJ
should consider a claimant's reported daily activities, the duration, frequency
and intensity of his or her pain, precipitating and aggravating factors,
medication, and functional restrictions." *Steed v. Astrue*, 524 F.3d 872, 875 n.4
(8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see* 20
C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). "The ALJ is not required to discuss
methodically each *Polaski* consideration, so long as [the ALJ] acknowledged
and examined those considerations before discounting [Buus's] subjective
complaints." *Steed*, 524 F.3d at 876 (internal quotation omitted). An ALJ must
make express credibility determinations detailing reasons for discounting a
claimant's subjective complaints of pain. *Dipple v. Astrue*, 601 F.3d 833, 837
(8th Cir. 2010). An ALJ's credibility determination is entitled to deference
because the ALJ is in a better position than a reviewing court to gauge
credibility. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

The ALJ found that "[Buus's] medically determinable impairments could cause some of the alleged symptoms. However, her statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible[.]" AR 22. The ALJ observed that the objective medical evidence was not consistent with respect to Buus's pain. AR 18 (noting that "repeated physical examinations showed relatively normal range of motion, muscle strength, and neurologic function."). The ALJ also observed that Buus's activities of daily living were inconsistent with her allegations of disabling pain. AR 17 (referencing Buus's testimony that she drove her own vehicle, went to the grocery store, helped take care of the two dogs at her parents' home, would attend monthly meetings for a woman's organization, and that she would help out with housekeeping from time to time). The ALJ concluded there was evidence showing her symptoms were managed primarily with medication and physical therapy, and that her treatment regime had primarily been conservative in nature. AR 22. The ability to successfully control pain with medication can be inconsistent with an allegation of disabling pain. *Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009). If an impairment can be controlled through treatment or medication, it cannot be considered disabling. *Id.* (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)). Additionally, the ALJ was concerned by the number of times Buus had been discharged from physical therapy, which suggested to the ALJ that "[Buus's] symptoms may not have been as serious as alleged[.]" AR 22. "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Guilliams v.*

28

*Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (citing *Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001)). The ALJ therefore concluded that Buus's allegations of pain were not fully credible.

The ALJ's conclusion is not without its flaws. First, the activities of daily living Buus enjoys, namely shopping, household chores, and occasional social activities, are not inherently inconsistent with the physical limitations she described. The Eighth Circuit has held that "the ability to engage in activities such as cooking, cleaning, and hobbies does not constitute substantial evidence" that a person with fibromyalgia is incredible. *Brosnahan v. Barnhart*, 336 F.3d 671, 667 (8th Cir. 2003); *see also Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001) (explaining "a claimant need not be bedridden to qualify for disability benefits.") (citation omitted). Second, physical examinations that show a relatively normal range of motion, muscle strength, and neurologic function can be consistent with normal results for fibromyalgia sufferers. *Cline v. Colvin*, 771 F.3d 1098, 1105 (8th Cir. 2014). Nonetheless, the ALJ noted a consistent pattern over a lengthy period of time where Buus's spine and joint functions were determined to be normal. AR 20-21; *see* AR 1087 (Dr. Sorensen noted that Buus's spinal range of motion was normal); AR 864 (Dr. Gavankar found that Buus had good strength and range of motion in her joints); AR 761 (Dr. Boetel found Buus's EMG study was normal).

Buus also takes issue with the ALJ's finding that her treatment regime was conservative and manageable with medication. The record shows, however, that Dr. Sorensen routinely recommended physical therapy or a home exercise

29

program to address her various manifestations of pain. *See* AR 334-35, 336, 339, 341, 343, 365. Other medical providers did the same. AR 297, 302 (Dr. Kimber), 299 (Dr. Haft), 751 (Dr. Gust), 761 (Dr. Boetel), 866 (Dr. Gavankar, aquatic therapy). A pattern of conservative treatment is a proper factor for the ALJ to consider in evaluating a claimant's credibility. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Buus's medical records do show that she was prescribed a number of medications, some of which were added or increased, and others were decreased or discontinued. *See, e.g.*, AR 818 (Neurontin increased), AR 835 (verapamil discontinued). The ALJ did not find Buus incredible for lack of prescribed pain medication, however, but found that the pain she experienced could be controlled by that medication. *Moore*, 572 F.3d at 524. The ALJ documented a number of instances where Buus reported positive responses to her medication. AR 19-21. And while Buus attended some of her recommended physical therapy, she was discharged on at least three separate occasions for failing to appear or for excess cancellations. AR 554, 466, 475. The ALJ was entitled to take those instances into consideration. *Guilliams*, 393 F.3d at 802. Thus, Buus may disagree with the ALJ's characterization of her treatment as conservative, as well as the ALJ's observation that she did not follow through with her treatment several times, but those observations are supported by the record.

Finally, Buus argues that the ALJ did not provide a detailed analysis for each *Polaski* criteria. For example, Buus notes that the ALJ did not include a specific finding as to her work history. Although this is true, the ALJ is not

required to explicitly discuss each *Polaski* factor, so long as the framework is acknowledged before discounting Buus's subjective complaints. *Steed*, 524 F.3d at 876. The ALJ also expressly made a credibility finding. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). And the issue before this court is not whether the ALJ's credibility finding is unassailable, but whether it is supported by substantial evidence. *Guilliams*, 393 F.3d at 801; *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). Substantial evidence is less than a preponderance, and the court may not reverse merely because substantial evidence would also support a conclusion opposite of that reached by the ALJ. *Pate-Fires*, 564 F.3d at 942. While the ALJ's credibility determination has its weaknesses, it is nonetheless supported by substantial evidence.

### B.  Medical Opinion Evidence

A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)). An ALJ may "discount or even disregard the opinion of a treating physician where . . . a treating physician

31

renders inconsistent opinions that undermine the credibility of such opinions."
*Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted). The
ALJ will also consider opinions from non-examining sources. 20 C.F.R.
§§ 404.1527(e); 416.927(e). If a treating physician's opinion is not given
controlling weight, the ALJ should consider several factors in weighing it and
any other medical opinions in the record, such as the length of the treatment
relationship and the frequency of examination, the nature and extent of the
treatment relationship, the supportability of the opinion, the consistency of the
opinion, and the specialization of the source. 20 C.F.R. §§ 404.1527(c);
416.927(c). The ALJ must always give good reasons for the weight afforded to a
treating physician's evaluation. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);
*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

### i.   Physical Limitations

#### a.   Dr. Todd Sorensen

Dr. Sorensen is a treating physician. He completed a check-mark RFC
questionnaire on March 6, 2013. AR 844-46. According to Dr. Sorensen, Buus
can occasionally lift less than 10 pounds, stand or walk less than 2 hours in
an 8-hour day, and must periodically alternate between sitting and standing in
order to relieve pain. AR 844. She is limited in her upper and lower extremities
because of weakness, and she cannot do repetitive motion. AR 845. She could
never climb, balance, stoop, kneel, crouch, reach overhead, or finger
(manipulation), and she could rarely handle or feel. AR 845. She needed to

32

avoid moderate exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, and hazards. AR 846.

### b.    Dr. Gregory Erickson

Dr. Erickson is a state agency physician who evaluated Buus's physical limitations. He completed an RFC assessment on January 20, 2012. AR 72-81.[22] Dr. Erickson's report includes a summary of many of Buus's medical records from July 20, 2010, through October 25, 2011. AR 75-76.  Dr. Erickson found that Buus could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. AR 78. She could stand or walk about 6 hours in an 8-hour day, and sit for about 6 hours in an 8-hour day. AR 79. Dr. Erickson also found that Buus could occasionally climb, stoop, kneel, crouch, and crawl. AR 79. He found that Buus had unlimited capacity to balance, and no manipulative, visual, communicative, or environmental limitations. AR 79. Based on his assessment, Dr. Erickson concluded Buus could perform light work. AR 80.

### c.    Dr. Kevin Whittle

Dr. Whittle is a state agency physician who, like Dr. Erickson, evaluated Buus's physical limitations. Upon reconsideration of Buus's file, Dr. Whittle completed his RFC assessment on June 25, 2012. AR 92-105.[23] Dr. Whittle's

---

[22] This report was created in conjunction with Buus's Title II application. Dr. Erickson created an identical report accompanying Buus's Title XVI application. AR 82-91. For convenience, and because the reports are the same, the court will reference the Title II report.

[23] Like Dr. Erickson, Dr. Whittle completed two identical reports for

report includes medical records generated through April 3, 2012. AR 97-98. Dr. Whittle reached the same conclusions regarding Buus's physical limitations as Dr. Erickson found. AR 101-102. Dr. Whittle similarly found that Buus could perform light work. AR 104.

### d.    ALJ's Conclusion

The ALJ chose to discount Dr. Sorensen's opinion because it "appears heavily reliant upon subjective report[s] of symptoms and limitations provided by the claimant. As discussed above, there exists good reason for questioning the reliability of the claimant's subjective complaints." AR 23. The ALJ further found that Dr. Sorensen's opinion was "not consistent with his own treatment records, which document minimal clinical findings, or with other medical evidence in the file." AR. 23. The ALJ thus chose to give the opinions of the state agency examiners greater weight. AR 23.

The Eighth Circuit has recognized that an ALJ may discount a treating physician's conclusions when those conclusions are largely based on the subjective reports of the claimant. *McDade v. Astrue*, 720 F.3d 994, 999 (8th Cir. 2013). Buus contends, correctly, that Dr. Sorensen needed to rely on her subjective complaints, particularly because Buus has been diagnosed with fibromyalgia. See *Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (noting that the ALJ misunderstood fibromyalgia when he indicated that objective medical testing was necessary since it is usually diagnosed through

---

Buus's Title II and Title XVI applications. AR 106-119. The first report will be referred to.

subjective complaints). Although the ALJ questioned the diagnostic techniques that led to Dr. Sorensen's initial diagnosis of fibromyalgia, he did not assume that Buus did not have the disorder.[24] Rather, the ALJ disputed the extent of Buus's condition.

The ALJ observed that Dr. Sorensen performed a number of examinations that revealed Buus retained generally normal physical functionality. For example, when Buus visited Dr. Sorensen in March 2011, her spinal range of motion was within normal limits. AR 336. When Dr. Sorensen diagnosed Buus with fibromyalgia, he noted that she did not have any pain, redness, or swelling of the joints. AR 357. In July 2011, Buus underwent a physical examination that was generally normal. AR 367. Again, Buus did not have pain, redness, or swelling of her joints. AR 366. When Dr. Sorensen saw Buus for her headaches in October 2011, she had no loss of balance, numbness, or weakness. AR 370. Buus again had a normal spinal range of motion and intact muscular strength. AR 373. Similar observations were made, along with findings that Buus's extremities were normal in January and April of 2012. AR 803, 817. Another physical exam was conducted on August 28, 2012, which was generally normal. AR 920. That November,

---

[24] Buus also notes that the ALJ stated a treating physician's opinion is usually afforded "great weight" rather than "controlling weight." AR 23. Despite the syntactical error, the ALJ stated that the treating physician's opinion would be accepted if "supported by medically acceptable clinical and laboratory diagnostic findings." AR 23. Thus, the ALJ did not analyze Dr. Sorensen's opinion under the incorrect standard. *See* 20 C.F.R. § 404.1527(c)(2) (noting a treating source is afforded controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case[.]").

although Dr. Sorensen recorded that Buus was experiencing joint pain, he
again noted that there was no redness or swelling of the joints and that she
was not experiencing any numbness or weakness. AR 1010. And in December
2012, Dr. Sorensen again found that Buus's spinal range of motion was
normal, her muscular strength was intact, and her extremities were normal.
AR 1087. As part of that same visit, Dr. Sorensen noted that Buus was
responding positively to her methotrexate prescription and had shown some
improvement. AR 1083. The body of evidence demonstrates that Dr. Sorensen's
own treatment records and clinical findings conflict with the extreme
limitations he suggests in his report. AR 844-46; s*ee Choate v. Barnhart*, 457
F.3d 865, 870 (8th Cir. 2006) (finding that the ALJ was permitted to disregard
claimant's treating physician's opinion when it was unsupported by other
evidence in the record, specifically when treating physician failed to place any
limitations on claimant's activities prior to disability filing).

Buus faults the ALJ's decision for not explicitly articulating the factors
set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). The ALJ noted, however,
that Dr. Sorensen was Buus's primary care provider, and the ALJ's opinion
discussed the numerous instances where Buus came to see Dr. Sorensen for
her care. AR 19-21, 23. Comparatively, the ALJ acknowledged that
Dr. Erickson and Dr. Whittle were non-examining physicians who reviewed
Buus's records. AR 22. Importantly, however, was the ALJ's determination that
Dr. Sorensen's conclusions regarding Buus's limitations were not consistent or
supported by either his own records or the record as a whole. AR 23. By

contrast, the ALJ determined Dr. Erickson's and Dr. Whittle's findings were consistent with and supported by the record. AR 23. Additionally, the RFC questionnaire filled out by Dr. Sorensen provided little context or reasoning for why he believed the limitations that he assigned to Buus were appropriate. The Eighth Circuit has explained that such evaluations do not convey much evidentiary value. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (agreeing "that a conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration.") (quotation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding the ALJ was correct to discount a treating physician's report which "consists of three checklist forms, cites no medical evidence, and provides little to no elaboration."). The ALJ was therefore justified in giving less weight to the questionnaire filled out by Dr. Sorensen. *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995) (finding the conclusory report from a treating physician was not entitled to any more weight than another medical opinion).

A review of the record as a whole further supports the ALJ's reliance on the state agency experts' conclusions over those given in Dr. Sorensen's report. For example, as to Buus's motor skills, she underwent a physical examination at the Sanford Orthopedics and Sports Medicine clinic on August 2, 2011, that revealed good balance and coordination. AR 291. Regarding balance, strength, and hand manipulation, Dr. Gavankar's examination showed that Buus could walk on her toes and heels, her "[m]uscle strength is 5/5," and that she had good range of motion in her joints. AR 864. On November 15, 2011, Dr. Boetel

37

performed an EMG, which was also normal despite complaints of pain. AR 760. Thus, the ALJ had good reasons to give Dr. Sorensen's report less weight.

As reflected in the RFC, the ALJ generally accepted the findings of Dr. Erickson and Dr. Whittle as consistent with the medical record in order to establish Buus's RFC. AR 22.[25] The ALJ believed, however, that additional environmental limitations were appropriate given Buus's headaches. AR 22; AR 18 (stating Buus "must avoid concentrated exposure to hazards, such as unprotected heights, [as well as] fast and dangerous machinery."). And although the state agency physicians did not have Buus's recent ophthalmology records, the ALJ also included Buus's use of corrective lenses in the CFR. AR 18. The weight ascribed to the medical opinion evidence as well as the ALJ's findings as they pertain to Buus's physical limitations is supported by substantial evidence.

---

[25] Buus takes issue with the ALJ's findings regarding her balance limitations. Both state agency physicians concluded Buus had no balance limitations. AR 79, 101. The ALJ's hypothetical to the vocational expert included the ability to frequently balance but only occasionally stoop, kneel, crouch, and crawl. AR 65. The ALJ's RFC, however, concluded Buus can "*occasionally* balance but stoop, kneel, crouch, and crawl only occasionally." AR 18 (emphasis added). The Commissioner submits this discrepancy is merely a typo, as evidenced by the disjunctive "but" which is meant to contrast Buus's ability to balance with her more restrictive limitations of stooping, kneeling, crouching, and crawling on an occasional basis. The Commissioner also points to the ALJ's finding that Buus reported no balance limitations to Dr. Sorensen. *See* AR 20. Given the state agency findings, the ALJ's hypothetical that incorporated those findings, and the use of the word "but," the court agrees that the ALJ's description that Buus had occasional balance limitations was a typographical error.

### ii.   Mental Limitations

#### a.   Dr. Doug Soule

Dr. Soule is a state agency physician who evaluated Buus's mental limitations. His assessment was included in the overall report of Dr. Erickson on January 20, 2012. AR 77. Dr. Soule found that Buus had no severe mental disorder, that she had mild restrictions of her activities of daily living, mild difficulty maintaining social functions, mild difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. AR 77.

#### b.   Dr. Richard Gunn

Dr. Gunn is a state agency physician who, like Dr. Soule, evaluated Buus's mental limitations. Dr. Gunn performed his evaluation on reconsideration of Buus's file, and his report accompanies Dr. Whittle's assessment from June 25, 2012. AR 99-100. In contrast to Dr. Soule's findings, Dr. Gunn assessed Buus with several severe mental disorders. AR 99.

Dr. Gunn also provided a mental RFC on July 5, 2012. AR 102-103. He found that Buus did not have any understanding or memory limitations. AR 102. She did, however, have some sustained concentration and persistence limitations. AR 102. Dr. Gunn found that Buus was not significantly limited in her ability to carry out short instructions, to adhere to a schedule, to work in proximity with others without becoming distracted, or to complete a normal workday and workweek. AR 102-03. Buus was found to be moderately limited in her ability to carry out detailed instructions and to maintain her attention

39

and concentration for extended periods. AR 102. Additionally, Dr. Gunn concluded that Buus had some social interaction limitations. AR 103. On one hand, Buus was not significantly limited in her ability to interact with the public, to ask simple questions or request assistance, to get along with coworkers or peers, or to maintain socially appropriate behavior. AR 103. One the other hand, Buus was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. AR 103. Finally, Dr. Gunn concluded that Buus did not have any adaptation limitations. AR 103.

### c.    ALJ's Conclusion

Although neither doctor examined Buus, the opinions of Dr. Soule and Dr. Gunn were the only medical opinions regarding Buus's mental limitations in the record. The ALJ accorded Dr. Gunn's opinion greater weight and generally adopted his findings. AR 23. By comparison, the ALJ concluded Dr. Soule's opinion received less weight because the record revealed a greater level of mental health treatment and functional limitations than those found by Dr. Soule. AR 23.

Buus asserts that the ALJ's RFC formulation of her mental limitations is at odds with the findings of the state agency physicians, and the ALJ did not explain how the differences were ascertained. For example, while Dr. Gunn found that Buus was not significantly limited in her ability to interact appropriately with the general public, the RFC states that Buus has moderate limits in interacting with the public. AR 103; 18. Dr. Gunn similarly found that

40

Buus did not have any adaptation limitations, but the RFC indicates Buus is moderately limited in adapting to changes her work routine or settings. AR 103; 18. And although the RFC states that Buus is limited to performing simple, routine, and repetitive tasks of three steps on average, Dr. Gunn's report did not include such a finding. AR 18. The Commissioner acknowledges that these limitations on Buus's ability to work are more restrictive than those determined by Dr. Soule and Dr. Gunn.

First, assuming Buus is correct and the ALJ simply included several more restrictive limitations, the effect of those additional limitations meant that Buus was considered able to perform less work, not more. And the ALJ nonetheless found that Buus was not disabled at step five in spite of those additional limitations. Had the ALJ adopted the less restrictive findings of the state agency examiners verbatim, the ALJ would have reached the same conclusion. Thus, the ALJ's error, if any, was harmless. *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("Even if the ALJ had not erred, there is no indication that the ALJ would have decided differently."); *see also Renstrom v. Astrue*, 680 F.3d 1057, 1068 (8th Cir. 2012); *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008). Second, the ALJ did rely on evidence in the record in order to make the findings it did. Beyond the findings of Dr. Soule and Dr. Gunn, the ALJ considered Buus's treatment history for anxiety and depression. AR 21-22. Similarly, although the ALJ found Buus not entirely credible, the ALJ considered her subjective complaints about her own mental limitations. AR 16-

18.[26] For example, Buus stated she feels nervous around people she does not know, that she sometimes has trouble with memory, and that she can't stay focused and becomes distracted easily. AR 233-35. She also indicated she does not handle stress well and has difficulty adjusting to changes in her routine. AR 234. And while Dr. Sorensen's opinion did not receive much weight, the one portion of his check-box questionnaire that included a handwritten notation stated Buus was limited in performing repetitive motion. AR 845. The ALJ was correct to consider these sources of evidence before condensing its ultimate findings into the RFC assessment. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004). On review, substantial evidence supports the ALJ's conclusion.

## CONCLUSION

Substantial evidence supports the ALJ's determination that Buus's eye condition was not a severe impairment. Substantial evidence also supports the ALJ's conclusion that Buus's conditions, considered individually or in combination, were not medically equivalent to a listed impairment. And substantial evidence supports the ALJ's determination of Buus's residual functioning capacity. Accordingly, it is

---

[26] The ALJ reviewed many of Buus's subjective allegations as part of its step two determination. The ALJ acknowledged, however, that those initial findings were not a standalone RFC assessment because that required "a more detailed assessment by itemizing various functions contained in the broad categories" discussed in the step two evaluation. AR 18. The ALJ concluded that the RFC reflected "the degree of [those] limitation[s]." AR 18.

ORDERED that the decision of the Commissioner is affirmed.

Dated May 18, 2015.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

43